# NO. 16-1803

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

### INTELLECTUAL VENTURES II LLC,

**Appellant**

v.

### ERICSSON INC., TELEFONAKTIEBOLAGET LM ERICSSON,

**Appellees**

---

**From the Patent Trial and Appeal Board No. IPR2014-01195,**
**Before Jameson Lee, Justin Busch, and J. John Lee**
**Administrative Patent Judges**

---

### BRIEF OF APPELLEES

---

Debra J. McComas
**HAYNES AND BOONE LLP**
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Telephone: 214.651.5375
Facsimile: 214.200.0525
*Debbie.McComas@haynesboone.com*

J. Andrew Lowes
Clint S. Wilkins
**HAYNES AND BOONE LLP**
2505 N. Plano Road, Suite 4000
Richardson, Texas 75082
Telephone: 972.680.7557
Facsimile: 972.692.9057
*Andrew.Lowes@haynesboone.com*
*Clint.Wilkins@haynesboone.com*

*Attorneys for Appellees, Ericsson Inc. and Telefonaktiebolaget LM Ericsson*

## CERTIFICATE OF INTEREST FOR ERICSSON INC.

Counsel for Appellee, Ericsson Inc. certifies the following:

1.    The full name of every party or amicus represented by me is:

Ericsson Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Telefonaktiebolaget LM Ericsson

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

David O'Dell of Haynes and Boone, LLP
John Russell Emerson of Haynes and Boone, LLP

Dated: September 12, 2016.

*/s/ J. Andrew Lowes* _____
J. Andrew Lowes

## CERTIFICATE OF INTEREST FOR
## TELEFONAKTIEBOLAGET LM ERICSSON

Counsel for Appellee, Telefonaktiebolaget LM Ericsson certifies the following:

1.    The full name of every party or amicus represented by me is:

Telefonaktiebolaget LM Ericsson

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Investor AB
AB Industrivarden
Svenska Hadelsbankens Pensionsstifte

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

David O'Dell of Haynes and Boone, LLP
John Russell Emerson of Haynes and Boone, LLP

Dated:  September 12, 2016.

/s/ J. Andrew Lowes
J. Andrew Lowes

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST FOR ERICSSON INC. ........................................... i

CERTIFICATE OF INTEREST FOR TELEFONAKTIEBOLAGET
    LM ERICSSON ...................................................................................... ii

TABLE OF AUTHORITIES ............................................................... vi

STATEMENT OF RELATED CASES .................................................1

STATEMENT OF THE ISSUES..........................................................1

INTRODUCTION ................................................................................3

STATEMENT OF THE CASE..............................................................4

I.      THE '431 PATENT ................................................................5

II.     THE PRIOR ART ................................................................8

    A.    Li...................................................................................8

    B.    Yamaura ....................................................................10

    C.    Zhuang.......................................................................13

    D.    Beta............................................................................14

    E.    Mody, Nobilet, and Popovic ...................................15

III.    THE PROSECUTION HISTORY ....................................16

IV.    THE IPR PROCEEDINGS................................................17

    A.    Ericsson's Petition for *Inter Partes* Review.........17

    B.    IV's Patent Owner Response.....................................18

    C.    Ericsson's Petitioner Reply ......................................19

    D.    Activities after Ericsson's Petitioner Reply ...........20

STANDARD OF REVIEW ...............................................................21

SUMMARY OF THE ARGUMENT ....................................................22

ARGUMENT ..................................................................................25

I.    THE BOARD APPLIED THE LAW OF OBVIOUSNESS
      CORRECTLY, AND THE MOTIVATION TO COMBINE IS
      SUPPORTED BY SUBSTANTIAL EVIDENCE. ......................................25

      A.    The Board (and Ericsson) Applied the Correct Legal
            Standard in Combining Prior Art References. ....................................25

      B.    The Board's Obviousness Analysis Is in Harmony with
            the Law and the Evidence and Did Not Lead to
            Anomalous Results..............................................................................29

            1.    IV's alleged problem solved by the challenged
                  claims is both incorrect and irrelevant to
                  Ericsson's reasons to combine the prior art.............................29

            2.    Substantial evidence supports combining Yamaura
                  and Beta through Li. .................................................................31

      C.    IV's New Arguments Regarding Inoperability and
            Teaching Away Are Not Properly Before the Court and
            Would Fail In Any Event Because They Are Not
            Factually Accurate...............................................................................32

            1.    IV's arguments regarding inoperability for the
                  Mody combination were not raised before the
                  Board and should not be considered by this Court...................32

            2.    IV's arguments for the Zhuang combination fail
                  because they mischaracterize Ericsson's
                  combination, and the Board's analysis, of Li and
                  Zhuang. ....................................................................................37

      D.    IV's New Argument Regarding the Combination of Li,
            Mody, Nobilet, and Popovic Is Incorrect............................................42

      E.    Ericsson's Petition Is Legally Sufficient, and The
            Board's Rationale for Combining Li and Yamaura Is
            Supported by Substantial Evidence.....................................................45

iv

F.      IV's Arguments Regarding Li's Teachings Are Both New (and, Therefore Waived) and Incorrect. ....................................48

II.    THE BOARD'S FINDING THAT THE PRIOR ART DISCLOSES THE CLAIMED ELEMENTS IS SUPPORTED BY SUBSTANTIAL EVIDENCE. ...............................................53

A.      The Board's Finding That the Prior Art Discloses the Claimed "Core-Band, Including a Plurality of Subcarrier Groups, Substantially Centered at an Operating Center Frequency of the Different Communication Schemes" Is Supported by Substantial Evidence......................................53

B.      The Board's Finding That the Prior Art Discloses a Core-Band That Is "Substantially Not Wider Than a Smallest Possible Operating Channel Bandwidth" Is Supported by Substantial Evidence. ........................................56

1.      The Board's understanding of the claim term "substantially not wider" is correct...........................................56

2.      The prior art discloses "the core-band is substantially not wider than a smallest possible operating channel bandwidth" under a correct construction of "substantially not wider." ................................60

CONCLUSION AND PRAYER ............................................................61

ECF CERTIFICATION ........................................................................63

CERTIFICATE OF COMPLIANCE.......................................................63

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allied Erecting & Dismantling Co., Inc. v. Genesis Attachments, LLC*,
  825 F.3d 1373 (Fed. Cir. 2016) ............................................................21, 25, 35

*In re Applied Materials, Inc.*,
  692 F.3d 1289 (Fed. Cir. 2012) ........................................................................31

*Ariosa Diagnostics v. Verinata Health, Inc.*,
  805 F.3d 1359 (Fed. Cir. 2015) ........................................................................47

*In re Baxter Int'l, Inc.*,
  678 F.3d 1357 (Fed. Cir. 2012) ........................................................................21

*Brand v. Miller*,
  487 F.3d 862 (Fed. Cir. 2007) ..........................................................................47

*Broadcom Corp. v. Emulex Corp.*,
  732 F.3d 1325 (Fed. Cir. 2013) ........................................................................30

*Cuozzo Speed Techs., LLC v. Lee*,
  136 S. Ct. 2131 (2016) ......................................................................................46

*Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*,
  279 F.3d 1022 (Fed. Cir. 2002) ..................................................................58, 59

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
  582 F.3d 1288 (Fed. Cir. 2009) ........................................................................32

*In re Fritch*,
  972 F.2d 1260 (Fed. Cir. 1992) ........................................................................27

*In re Gartside*,
  203 F.3d 1305 (Fed. Cir. 2000) ........................................................................21

*Gillette Co. v. S.C. Johnson & Son, Inc.*,
  919 F.2d 720 (Fed. Cir. 1990) ..........................................................................26

*Golden Bridge Tech., Inc. v. Nokia, Inc.*,
  527 F.3d 1318 (Fed. Cir. 2008) ........................................................................32

*Grain Processing Corp. v. Am. Maize-Prods., Co.*,
   840 F.2d 902 (Fed. Cir. 1988) ...........................................................27

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*,
   821 F.3d 1359 (Fed. Cir. 2016) ..........................................................47

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
   751 F.3d 1327 (Fed. Cir. 2014) ..........................................................28

*K/S Himpp v. Hear-Wear Techs., LLC*,
   751 F.3d 1362 (Fed. Cir. 2014) ..........................................................21

*In re Keller*,
   642 F.2d 413 (CCPA 1981) ................................................................25

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
   688 F.3d 1343 (Fed. Cir. 2012) ..........................................................30

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007)....................................................................*passim*

*Microsoft Corp. v. Proxyconn, Inc.*,
   789 F.3d 1292 (Fed. Cir. 2015) ..........................................................57

*In re Mouttet*,
   686 F.3d 1322 (Fed. Cir. 2012) ...............................31, 36, 53, 54, 55

*Pfizer, Inc. v. Apotex, Inc.*,
   480 F.3d 1348 (Fed. Cir. 2007) ..........................................................25

*Power-One, Inc. v. Artesyn Techs., Inc.*,
   599 F.3d 1343 (Fed. Cir. 2010) ..........................................................25

*Rogers v. Desa Int'l Inc.*,
   198 F. App'x 918 (Fed. Cir. 2006)......................................................28

*S. Ala. Med. Sci. Found. v. Gnosis S.P.A.*,
   808 F.3d 823 (Fed. Cir. 2015) ............................................................26

*In re Sneed*,
   710 F.2d 1544 (Fed. Cir. 1983) ..........................................................53

*Trustees of Columbia Univ. v. Illumina, Inc.*,
   620 Fed. App'x 916 (Fed. Cir. 2015) ...................................................................21

*In re Warsaw Orthopedic, Inc.*,
   __ F.3d __, 2016 WL 4191193 (Fed. Cir. Aug. 9, 2016) ...................................27

**Statutes**

35 U.S.C. § 103(a) ...........................................................................................17, 25

35 U.S.C. § 112 .....................................................................................................16

35 U.S.C. § 314(d) .................................................................................................46

**Other Authorities**

*Patent Trial Practice Guide*,
   77 Fed. Reg. 48 (Aug. 14, 2012) .................................................................35, 49

## STATEMENT OF RELATED CASES

Appellees, Ericsson Inc. and Telefonaktiebolaget LM Ericsson ("Ericsson"), agree with Appellant Intellectual Ventures II LLC ("IV") that "there is no other appeal in or from the same proceeding before the Patent Trial and appeal Board of the U.S. Patent and Trademark Office (the "Board") that was previously before this or any other appellate court."

Ericsson does not agree, however, that the district court cases identified by IV in its Statement of Related Cases "may be directly affected by this Court's decision in the pending appeal." Indeed, as IV concedes, the claims at issue in this appeal "are not asserted in the pending litigation."

## STATEMENT OF THE ISSUES

1.    Based on the substantial evidence before it, did the Board properly find a motivation to combine multiple prior art references so as to render each of the limitations of the patents at issue obvious?

2.    The Board found claims 1 and 2 of the '431 Patent unpatentable as obvious in light of two different combinations of prior art references: (1) Li, Yamaura, Zhuang, and Beta (the "Zhuang combination") and (2) Li, Yamaura, Mody, Nobilet, Popovic, and Beta (the "Mody combination"). IV argues before this Court that the Board erred in combining certain of the proposed combinations because those combinations would allegedly render the primary prior art reference

inoperable. IV never raised this argument below as to the Mody combination. As to the Zhuang combination, IV rests its inoperability argument on the presumption that Ericsson and the Board were relying upon Zhuang as replacing pilot signals in Li, which they did not. Under these circumstances,

    a. Did the Board properly reject IV's argument regarding "inoperability"?

    b. Did IV waive any "inoperability" arguments as to the Mody combination?

3.    The parties' dispute regarding whether the prior art discloses a core-band that is "substantially not wider than a smallest possible operating channel bandwidth" turns on the construction of the term "substantially not wider." Did the Board correctly conclude that "not wider" means less than or equal to? Further, did the Board correctly conclude that the term "substantially" in the term "substantially not wider" is a term of approximation and not a term of magnitude?

4.    Is the Board's determination that the prior art discloses "core-band, including a plurality of subcarrier groups, substantially centered at an operating center frequency of the different communication schemes" supported by substantial evidence?

**INTRODUCTION**

The Board found claims 1 and 2 of the '431 Patent unpatentable as obvious in light of two different combinations of prior art references. IV does not attack the substance of the substantial evidence supporting reasons to combine either of these two combinations. Instead, IV (i) complains of the number of prior art references the Board combined to find obviousness, suggesting that the law sets limits on the number and ways combinations should be combined to show obviousness; (ii) mischaracterizes the stated reasons to combine Zhuang, erecting a strawman argument about inoperability, and (iii) makes new arguments regarding the combination with Mody, Nobilet, and Popovic never made in the proceeding below. Peppered in with these main arguments, IV also accuses Ericsson and the Board seriatim of failing to make proper findings or failing to support the findings with evidence. Looking to the record below as it was actually created, IV's arguments easily fall in the face of the substantial evidence.

Moreover, contrary to IV's suggestion, the law sets no limit on the number of prior art references that can be considered in finding an invention obvious. The question of whether one of ordinary skill in the art would be motivated to combine known references to achieve the invention is one of fact to be decided based on the substantial evidence in a given case. That is the standard established by the Supreme Court in *KSR Int'l Co. v. Teleflex, Inc.* It is the standard followed by

numerous cases since *KSR*. And it is the standard followed by the Board below in this case. Indeed, the Board's findings, supported by substantial evidence, are in line with countless other cases applying similar prior art combinations to find obviousness.

Finally, IV attacks the Board's construction of the claim term "substantially not wider," and in particular the term "substantially," arguing for a definition of the term "substantially" that relates to magnitude rather than one of approximation. But IV's proposed construction would require the Court to ignore the extensive intrinsic evidence, which squarely supports the Board's construction of the claim term "substantially" to relate to approximation. Further, IV uses its misunderstanding of "substantially" to argue for a construction of "not wider" that excludes embodiments covered by the plain meaning of "not wider."

In the end, IV's arguments do nothing to distract from the Board's reasoned Decision, supported by substantial evidence, and the judgment should, accordingly, be affirmed.

## STATEMENT OF THE CASE

This appeal arises from the Board's January 29, 2016 Final Written Decision, which finds that claims 1 and 2 of U.S. Patent No. 7,787,431 ("the '431 Patent") are unpatentable as obvious over two different combinations of prior art references: (1) Li, Yamaura, Zhuang, and Beta and (2) Li, Yamaura, Mody,

Nobilet, Popovic and Beta. Appx1-28. The following Statement of the Case summarizes the relevant claims of the '431 Patent, the prior art combinations relied upon by the Board, and the substantial evidence and reasoning relied upon by the Board in finding claims 1 and 2 unpatentable as obvious.

## I.    THE '431 PATENT

The claims of the '431 Patent conceptually relate to and can be divided into three aspects of communication technology:

(1) variable bandwidth multi-carrier systems;

(2) characteristics of a core-band; and

(3) properties of a primary preamble, which is transmitted in the core-band.

For example, claim 1 is reproduced below, annotated to show the three aspects identified above[1]. Appx227-228. These aspects form a conceptual framework for understanding the claims. Appx1941-1942 at ¶¶ 24-25.

> 1. In a variable bandwidth wireless communication system communicating under multiple different communication schemes that each have a different bandwidth, a process performed by a base station of

---

[1] During prosecution it was the third aspect, relating to the properties of the primary preamble, that resulted in claim allowance. Specifically, a dependent claim directed to properties of a primary preamble was indicated as allowable. Appx1772. After a final rejection, the Applicant authorized an Examiner's Amendment for claim 1 (Appx1618), which included the subject matter of this dependent claim. The Examiner's Amendment added the entirety of aspect (3), described above with reference to claim 1. Appx1842. IV does not contest that the prior art discloses this aspect.

generating an information bearing signal for wireless transmission, the process comprising:

**[Aspect (1): variable bandwidth]**

utilizing by the base station a number of subcarriers to construct a variable bandwidth wireless channel;

utilizing by the base station groups of subcarriers, wherein each group includes a plurality of subcarriers;

maintaining a fixed spacing between adjacent subcarriers;

adding or subtracting, by the base station, groups of subcarriers to scale the variable bandwidth wireless channel and achieve an operating channel bandwidth; and

**[Aspect (2): core-band]**

wherein a core-band, including a plurality of subcarrier groups, substantially centered at an operating center frequency of the different communication schemes, is utilized by the base station as a broadcast channel carrying radio control and operation signaling [*sic*], where the core-band is substantially not wider than a smallest possible operating channel bandwidth of the system; and

**[Aspect (3): properties of a primary preamble]**

wherein the information bearing signal has a primary preamble sufficient for basic radio operation and wherein:

the primary preamble is a direct sequence in the time domain with a frequency content confined within the core-band, or is an orthogonal frequency-divisional multiplexing (OFDM) symbol corresponding to a particular frequency pattern within the core-band; and

wherein properties of the primary preamble comprise:

an autocorrelation having a large correlation peak with respect to sidelobes;

a cross-correlation with other primary preambles having a small cross-correlation coefficient with respect to power of other primary preambles; and

a small peak-to-average ratio; and wherein a large number of primary preamble sequences exhibit the properties.

Referring to aspect (1), the '431 Patent relates generally to multi-carrier

communication systems. Appx212 at 1:43-47 and 2:36-38; *see also* Appx1937-

1938, ¶ 19. The bandwidth, or frequency spectrum, of a multi-carrier system is

subdivided into "small units" known as "subcarriers." Appx213 at 3:7-14. The multi-carrier format facilitates "variable channel bandwidth … by adjusting the number of usable subcarriers." Appx213 at 4:25-26. According to the equations in Fig. 2 of the '431 Patent, which is admitted prior art, bandwidth is proportional to the number of subcarriers. *See id.* at Fig. 2 and Appx1939 at ¶ 21. The same concepts are disclosed in U.S. Patent No. 6,904,283 ("Li").

Referring to aspect (2), the '431 Patent states: "To facilitate the user terminals to operate in a variable bandwidth (VB) environment, specific signaling and control methods are required. Radio control and operation signaling is realized through the use of a core-band (CB)." Appx213 at 4:64-67. The core-band is used to transmit control signals including preambles: "[i]n one embodiment relevant or essential radio control signals such as ***preambles***, ranging signals, bandwidth request, and/or bandwidth allocation are transmitted within the CB." Appx214 at 5:8-13 (emphasis added). An example of a narrow band used to transmit control signals in an OFDM system is disclosed in U.S. Patent No. 7,782,750 ("Yamaura"). As addressed in more detail below, the control signals in Yamaura are transmitted in a preamble using subcarriers centered at an operating frequency.

Referring to aspect (3), claim 1 recites certain properties for the preamble sequences, including autocorrelation, cross-correlation, and peak-to-average ratio properties. As argued by IV, the "primary preamble is readily and reliably identified"

when it possesses these properties. IV Br. at 8. Thus, the primary preamble has properties that allow it to be identified to, for example, provide an effective mechanism for synchronization purposes. Appx3215 at ¶ 21. As addressed in more detail below, examples of a preamble sequence having the claimed properties are disclosed in U.S. Patent No. 7,426,175 ("Zhuang"), as well as in the combination of Mody (App797-819), Nobilet (Appx820-829), and Popovic (Appx1519-1527).

## II.    THE PRIOR ART

The Board found claims 1 and 2 of the '431 Patent unpatentable as obvious in view of two different combinations of prior art references: (1) Li, Yamaura, Beta, and Zhuang (the "Zhuang combination"); and (2) Li, Yamaura, Beta, Mody, Nobilet, and Popovic (the "Mody combination"). Appx27. An overview of each of these references is provided below.

### A.    Li

Like the '431 Patent, Li also relates to multi-carrier wireless communication systems. Li presents its embodiments in the context of an example multi-carrier format known as orthogonal frequency division multiplexing (OFDM), in which the available frequency band is divided into subcarriers. According to Li, "[i]n OFDM, a wide bandwidth is divided into multiple narrow-band subcarriers, which are arranged to be orthogonal with each other. The signals modulated on the subcarriers are transmitted in parallel." Appx730 at 1:18-22. The subcarriers are

divided into clusters. As an example, in Li's Fig. 1A (reproduced below), four consecutive subcarriers form a cluster.



Li describes this in detail as follows:

> FIG. 1A illustrates multiple subcarriers, such as subcarrier 101, and cluster 102. A cluster, such as cluster 102, is defined as a logical unit that contains at least one physical subcarrier, as shown in FIG. 1A. A cluster can contain consecutive or disjoint subcarriers. The mapping between a cluster and its subcarriers can be fixed or reconfigurable. … In one embodiment, the frequency spectrum includes 512 subcarriers and each cluster includes four consecutive subcarriers, thereby resulting in 128 clusters.

Appx732 at 5:18-27.

A base station can assign a subscriber one or more clusters of subcarriers. At a later time, the number of clusters can be increased, thereby increasing bandwidth (i.e., the bandwidth is variable). For example, in one embodiment, Li discloses that:

> the base station first allocates multiple clusters, referred to herein as the basic clusters, to establish a data link between the base station and the subscriber. ***The base station then subsequently allocates more***

> ***clusters, referred to herein as the auxiliary clusters, to the
> subscriber <u>to increase the communication bandwidth</u>***.

Appx732 at 6:43-48.

Li focuses on data traffic channels and indicates that there are
typically other channels used for exchange of control information.

> The techniques described herein are directed to subcarrier allocation
> for data traffic channels. In a cellular system, there are typically other
> channels, pre-allocated for the exchange of control information and
> other purposes. These channels often include down link and up link
> control channels, uplink access channels, and time and frequency
> synchronization channels.

Appx732 at 5:11-17.

## B.   Yamaura

Yamaura also relates to (OFDM) multi-carrier wireless communication
systems. Appx771 at 1:10-18. Yamaura is concerned with control signaling: "[t]he
present invention was completed to reduce loads in a base station or a terminal
station when control signals are transmitted from a base station to a terminal
station in the radio communication system of the type mentioned above." Appx773
at 5:64-67.

Yamaura points out that control signals in conventional systems consume
too much power (leading to a "waste of batteries"), providing specifically as
follows:

> the signal to call a terminal station from a base station is transmitted, with all
> information placed on subcarriers in the transmission band, and the called

terminal station receives all the subcarriers to receive the calling signal. This means that the terminal station has to receive and decode the band signal (corresponding to 20 MHz) every 2 ms regardless of presence or absence of data being transmitted and received. It follows, therefore, that large quantities of signals have to be processed even when no information data is transmitted and received. This leads to a waste of batteries in the case where the terminal station is a battery-driven mobile station.

Appx773 at 5:39-50.

To reduce power consumption, Yamaura discloses a system in which "part of control signals addressed to a terminal station from a base station is transmitted *by means of a carrier whose band is narrower than that for said multi-carrier signals*…" Appx773 at 6:5-8 (emphasis added). An example of control signals narrower than that for a multi-carrier signal is presented in Fig. 16, reproduced below. In the figure, subcarriers $SC_1$ and $SC_2$ carry control signals. Appx781 at 21:11-15.

The control signals are transmitted in a broadcast preamble using the subcarriers centered at an operating frequency. Appx1954-1955 at ¶¶ 40-41. For example, referring to Fig. 17, Yamaura explains:

> [t]he broadcast burst consists of BCH for the multiple addressing of broadcast preamble and base station information, FCH to inform each terminal station of the traffic channel allocation in the same frame, and ACH for reply to RCH used for calling from the terminal station. In the case of this embodiment, *the two subcarriers $SC_1$ and $SC_2$ shown in FIG. 16 are used for transmission of specific control signals in the sections of broadcast <u>preamble</u>*, BCH, and FCH in the broadcast burst.

Appx781 at 21:7-15 (emphasis added). Fig. 17 is reproduced below (color annotations added). Appx1957 at ¶ 43.



The narrowband control signals, such as those transmitted using $SC_1$, and $SC_2$ above, are used to provide a call signal to a terminal station so that the terminal station can judge whether the terminal station is being called. Appx1961 at ¶ 49. Yamaura explains as follows:

> Part of the control signals to be transmitted from the base station to the terminal station by means of the narrow-band carrier is, for example, a call signal to call terminal stations individually or as a group. Upon reception of this call signal, the terminal station can judge that there is a call from the base station.

Appx775 at 10:58-63.

Cross correlation detection is used to detect the narrowband control signal. Appx1960 at ¶ 47. For example, "FIG. 15 shows the constitution of the control signal receiving unit 242 in the terminal station shown in FIG. 6. *It is so constructed as to receive the control signal by means of simple cross correlation*

*detection*." Appx780 at 19:64-67 (emphasis added). Thus, Yamaura recognizes the transmission of preambles in a core-band as well as using cross correlation to detect the presence of the control signals in the preamble.

Furthermore, Yamaura discloses a combined pilot symbol and PN series as a sequence that modulates one or more narrowband subcarriers in a preamble as follows:

> [f]or spectrum spreading, the signal having the pilot symbol added by the pilot adding means 136 is multiplied by means of the multiplier 134 by the pseudo random series generated by the PN series generating means 135. The spread output is transmitted by means of the narrow-band carrier or specific subcarrier as in the case shown in FIG. 9.

Appx779-780 at 18:66-19:4; Appx1961 at ¶ 48. Yamaura does not disclose specific preamble sequences, leaving that to a person of ordinary skill in the art (POSITA) to determine. Appx552.

## C.     Zhuang

Zhuang addresses a "need [that] exists for a method and apparatus for pilot signal or **preamble transmission** that optimizes both the cross correlation between pilot signals, as well as optimizing each pilot signal's auto correlation." Appx790 at 2:7-10 (emphasis added). To address the need, Zhuang discloses specific preamble sequences with desirable properties, including:

> A pilot signal (or ***preamble***) is commonly used for communication systems to enable the receiver to perform a number of critical functions, including but not limited to, the acquisition and tracking of timing and frequency synchronization, the estimation and tracking of

13

desired channels for subsequent demodulation and decoding of the information data, the estimation and monitoring of the characteristics of other channels for handoff, interference suppression, etc.

Appx790 at 1:12-19 (emphasis added).

pilot sequences are constructed from distinct "classes" of chirp sequences that have an optimal cyclic cross correlation property while satisfying the ideal cyclic autocorrelation requirement. Utilization of chirp sequences for pilot sequences results in pilot channels that have good cross correlation as well as having good auto-correlation.

Appx790 at 2:22-29. Thus, Zhuang discloses that preambles are commonly used for synchronization and channel estimation.

Zhuang describes properties of "Generalized Chirp-Like" sequences, which are used as preambles in an OFDM system and include good autocorrelation and crosscorrelation, and low PAPR. Appx790 at 2:55-58; Appx792 at 5:9-15 and 6:5-6; *see also* Appx1967 at ¶ 56.

### D.    Beta

As shown in the table from Beta below, Beta discloses variable bandwidth in units of 100 kHz (24 subcarriers) within an available bandwidth of 100 kHz, 200 kHz, 400 kHz, 800 kHz, or 1.6 MHz, which allows for "flexible" deployment according to the table.

| | |
|---|---|
| Timeslot Length | 288µs |
| Bandslot Width (Minimum BW) | 100kHz (24 subcarriers) |
| Data frame length | 4.615ms (16 slot/frame) |
| Bandwidth | 100kHz, 200kHz, 400kHz, 800kHz, 1.6MHz (flexible) |
| Frequency Hopping | 1 (hop/burst) = 867 hop/s (no hopping option) |
| Channel Coding | Convolution coding, rate 1/3-2/3, |

Appx1005; Appx1974 at ¶ 70 (color annotation added). Each set of 24 subcarriers constituting 100 kHz is a "group" of subcarriers as the term is used in the claims of the '431 patent. Appx1974 at ¶ 70.

Beta also discloses allocating a variable number of bandslots (and therefore variable bandwidth). Appx1027; Appx1974 at ¶ 70. "The resources (time and frequency) are allocated based on the type of services, operational environment/scenarios) (i.e., give more flexibility)." Appx1027. The modes of "resource allocations" include an integer number "n" time slots plus an integer number "n" band slots. Appx1027. That is, a variable number of time slots and a variable number of bandslots (variable bandwidth) can be used for resource allocation. Appx1974 at ¶ 70. Thus, a variable number of bandslots may be allocated, each of which is 100 kHz, which allows the bandwidth to vary in any of the available bandwidths of 200 kHz, 400 kHz, 800 kHz, and 1.6 MHz. Appx1974 at ¶ 70. Beta's available bandwidths represent different operating bandwidths. Appx266.

### E.    Mody, Nobilet, and Popovic

Mody, Nobilet, and Popovic are used in place of Zhuang in the second challenge. Mody discloses that OFDM systems are typically divided into two categories: (1) Single-Input, Single-Output (SISO) systems and (2) Multi-Input, Multi-Output (MIMO) systems. Appx807 at ¶ 6. Mody describes the use of

preambles, a term Mody uses interchangeably with the term "training symbols," in OFDM systems: "The present invention utilizes a sequence of ***training symbols or preambles*** that may be used in both Single-Input, Single-Output (SISO) and Multi-Input, Multi-Output (MIMO) systems, using any number of transmitting and receiving antennas." Appx807 at ¶ 9. Further, Mody discloses using "chirp-like" training symbols, or preambles. Appx810 at ¶ 41; Appx1970 at ¶ 61.

Nobilet discloses that certain generalized chirp-like sequences, known as Zadoff-Chu sequences, have optimum correlation properties. Appx822. The number of such sequences is large. Appx1971-1972 at ¶¶ 65-66. Popovic discloses that the cross-correlation properties of Zadoff-Chu sequences are the best possible. Appx1523.

## III.    THE PROSECUTION HISTORY

The term "substantially" was addressed during prosecution of the original claims and resulted in a specific understanding of the term that was consistent with the Board's construction below.

Specifically, the claims as originally filed included numerous instances of the term "substantially," including the phrase "substantially not wider than a smallest possible operating channel bandwidth of the system." Appx1841. During an Examiner interview, an Examiner "mentioned that the word 'substantially' in applicants' various claims may be indefinite under 35 U.S.C. § 112, second

paragraph." Appx1724. In response, the Applicant addressed the use of the term "substantially" as follows:

> Applicants also submit that applicants' use of "substantially" is definite under § 112, second paragraph due ***at least to limitations of the English language as well as real-world technological limitations***. For instance, applicants' phrase "a core band ... **substantially** centered at an operating center frequency[,]" ***and similar***, balance clarity with the fact that real-world systems have process and operational tolerances whereby a core-band **may not be exactly** centered at an operating center frequency despite efforts to center the core band at the operating center frequency. Accordingly, one of ordinary skill in the relevant art would understand applicants' use of "substantially" in the above claims.

Appx1725 (emphasis added). The term "substantially" is thus used in the claims as a term of approximation to "balance clarity with the fact that real-world systems have process and operational tolerances." Appx1725; *see also* Appx533.

## IV. THE IPR PROCEEDINGS

### A. Ericsson's Petition for *Inter Partes* Review

In IPR2014-01195, Ericsson challenged claims 1 and 2 of the '431 Patent on two separate grounds: (1) the claims are unpatentable under 35 U.S.C. § 103(a) over the combination of Li, Yamaura, Beta[2], and Zhuang; and (2) the claims are unpatentable under 35 U.S.C. § 103(a) over the combination of Li, Yamaura, Beta, Mody, Nobilet and Popovic. Other claims not at issue here were challenged under different combinations of references. In support of its Petition, Ericsson filed a

---

[2] Beta and UTRA were used interchangeably in the proceedings below to refer to the same reference.

supporting expert declaration of Dr. Zygmunt Haas. Appx1930-2055. Ultimately, the Board instituted *Inter Partes* Review of claims 1 and 2 on both grounds.

### B.    IV's Patent Owner Response

IV argued in its Patent Owner Response that "'substantially not wider' means 'significantly not wider,' for example 'significantly narrower than,'" treating  the term "substantially" as a term of magnitude modifying "not wider." Appx476. IV further argued that under its construction a core band of 100 kHz is not "substantially not wider" than a smallest operating channel bandwidth of 100 kHz because "equal to" does not satisfy its proposed claim construction. Appx489-490. IV did not mention that the term "substantially" was specifically addressed in the prosecution history.

IV also argued in its Patent Owner Response that none of the prior art references discloses "a core-band, including a plurality of subcarrier groups, substantially centered at an operating center frequency of the different communication schemes." Appx483-485.

Unlike the lengthy arguments now made before this Court, IV's argument regarding inoperability in its Patent Owner Response was a skeletal argument consisting of four sentences at the end of a four-page section entitled "There is No Reason To Combine Yamaura and Zhuang." Appx506. The term "inoperable"

appears only once in the *entire* Patent Owner Response. IV made no arguments about inoperability regarding the Mody combination.

IV also argued in its Patent Owner Reply, with respect to the combination of Li and Yamaura, that Li purportedly has a mechanism for exchanging control information, making a combination with Yamaura unnecessary. Appx502. The only support cited for this proposition is paragraph 135 of IV's expert declaration, which discusses only uplink control information, citing Li's "uplink access channel." Appx3445, ¶ 135. On appeal, in contrast, IV now focuses on a new argument based on "downlink" control information[3]. IV Br. at 40-41.

### C.    Ericsson's Petitioner Reply

Ericsson submitted a Petitioner Reply, supported by a Supplemental Declaration from its expert.

Ericsson pointed out that the claim term "substantially," which appears in "substantially not wider," was addressed during prosecution and that the term "substantially" is used in the claims as a term of approximation. Appx533. Ericsson also pointed out that nothing in the language of the specification or the supporting provisional application suggests that the inventors meant to exclude embodiments that satisfy "less than or equal to" but do not satisfy IV's

---

[3] Ericsson agrees with IV that "uplink" refers to transmission from a mobile station to a base station, whereas "downlink" refers to transmission from a base station to a mobile station. IV Br. at 40, n. 7.

construction of "significantly not wider." Appx533. IV's expert, Dr. Zeger, also was unable to point out how a person of ordinary skill would determine when one bandwidth is "significantly narrower than" as opposed to simply "narrower than." Appx534.

Ericsson also provided further detail regarding Li's variable bandwidth in combination with Yamaura. Appx542-544. Finally, Ericsson addressed the arguments IV actually made in its Patent Owner Response with respect to the combination of Li and Yamaura and with respect to Yamaura and Zhuang.

### D.    Activities after Ericsson's Petitioner Reply

IV made no attempt to cross-examine Ericsson's expert or to file observations on the cross-examination, choosing instead to proceed to oral hearing without further comment. At the oral hearing, IV made a belated attempt to urge the inoperability argument, but, even then, the argument was narrow and unsupported by the briefing or evidence. Indeed, the only slide having any detail about inoperability in IV's Demonstratives for Oral Argument was slide 64. This slide related solely to the first ground of obviousness for the Zhuang combination. IV presented no detail regarding alleged inoperability of the second ground of obviousness for the Mody combination. Nonetheless, IV made inoperability on the basis of Li and Zhuang its leading argument during the oral hearing. Appx636, 12-

13. The Board questioned IV extensively about its inoperability position during the oral hearing. Appx639:13-Appx645:3.

## STANDARD OF REVIEW

The issue before this Court is one of obviousness. While the ultimate question of obviousness is a question of law reviewed de novo, in determining whether the claims encompass prior art or whether there was a motivation by one skilled in the art to combine the prior art, the Court looks only for substantial evidence supporting the Board's findings. *See Allied Erecting & Dismantling Co., Inc. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1380 (Fed. Cir. 2016); *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1361 (Fed. Cir. 2012). "A finding is supported by substantial evidence if a reasonable mind might accept the evidence to support the finding." *Trustees of Columbia Univ. v. Illumina, Inc.*, 620 Fed. App'x 916, 921 (Fed. Cir. 2015) (quoting *K/S Himpp v. Hear-Wear Techs., LLC*, 751 F.3d 1362, 1364 (Fed. Cir. 2014)); *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000).

## SUMMARY OF THE ARGUMENT

Claims 1 and 2 of the '431 Patent claim inventions that already existed in a wealth of prior art references that were known to those of ordinary skill in the art. Faced with such a wealth of prior art and evidence of motivation to combine that prior art to achieve the claimed inventions, the Board found claims 1 and 2 unpatentable as obvious in light of two different combinations of prior art references. The first combination – the Zhuang combination – includes Li, Yamaura, Zhuang, and Beta. The second combination – the Mody combination – includes Li, Yamaura, Mody, Nobilet, Popovic, and Beta.

IV does not attack the substance of the substantial evidence supporting reasons to combine either of these two combinations. Instead, IV creates legal issues where none exist, creates strawman arguments not related to the Board's findings or Ericsson's arguments below, and raises new arguments never raised below. Specifically, IV (i) complains of the number of prior art references the Board combined to find obviousness, suggesting that the law sets limits on the number and ways combinations should be combined to show obviousness; (ii) mischaracterizes the stated reasons to combine the Zhuang combination, erecting a strawman argument about inoperability, and (iii) makes new arguments regarding the Mody combination never made in the proceeding below. IV also

accuses Ericsson and the Board seriatim of failing to make proper findings or failing to support the findings with evidence.

Applying the proper law and looking to the record below as it was actually created, though, IV's arguments easily fall in the face of the substantial evidence. First, contrary to IV's suggestion, the law sets no limit on the number of prior art references that should be considered in finding an invention obvious. The Supreme Court in *KSR Int'l Co. v. Teleflex, Inc.* rejected any rigid test for determining obviousness and held instead that the question of whether one of ordinary skill in the art would be motivated to combine known references to achieve the invention is a fact-intensive inquiry decided on a case-by-case basis. As seen in numerous cases since *KSR* such a factual inquiry may result in combinations of any number of prior art references. Here, the substantial evidence fully supports the Board's findings of a motivation to combine the prior art references and IV points to no evidence to contradict those findings.

IV also complains that the Board improperly combined certain prior art references because those references would be rendered inoperable by the combination. But this argument was never raised below as to the Mody combination and should not, therefore, be considered now. And even as to the Zhuang combination, IV has made only a cursory argument that rests on the improper assumption that Ericsson (and ultimately the Board) was applying

Zhuang as replacing pilot signals in Li. It was not. In truth, IV's inoperability position misses the point entirely as the Zhuang combination is focused on combining *preambles* of Yamaura and Zhuang with Li's variable bandwidth teachings and has nothing to do with Li's pilot signals. Ericsson's argument (and the Board's reasoning) does not rely upon any replacement of Li's pilot signals.

Finally, IV attacks the Board's construction of the claim term "substantially not wider," arguing for a definition of the term "substantially" that relates to magnitude rather than one of approximation. But IV's proposed construction would require the Court to ignore the extensive intrinsic evidence, which squarely supports the Board's construction of the claim term "substantially" to relate to approximation. Further, IV's misunderstanding of "substantially" as a term of magnitude would, according to IV's reasoning, require that the term "not wider" be construed in such a way that excludes embodiments covered by the plain meaning of "not wider."

In the end, IV's arguments do nothing to distract from the Board's reasoned Decision, supported by substantial evidence, and the judgment should, accordingly, be affirmed.

# ARGUMENT

## I. THE BOARD APPLIED THE LAW OF OBVIOUSNESS CORRECTLY, AND THE MOTIVATION TO COMBINE IS SUPPORTED BY SUBSTANTIAL EVIDENCE.

### A. The Board (and Ericsson) Applied the Correct Legal Standard in Combining Prior Art References.

A patent claim is invalid as obvious "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a) (2006). The "'test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference,' but rather whether [taking the prior art teachings as a whole,] 'a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention.'" *Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016) (quoting *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) and *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007)). Thus, it is not necessary that all prior art references be capable of being physically combined together in a single invention to render a patent claim obvious. *Id.* What is required is a "a plausible rational [*sic*] as to why the prior art references would have worked together to render the claims [] obvious." *Power-One, Inc. v. Artesyn Techs., Inc.,* 599 F.3d 1343, 1352 (Fed. Cir.

2010). As explained by the Supreme Court in *KSR Int'l Co. v. Teleflex Inc*., 550 U.S. 398 (2007)*,* "[o]ften, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue."[4] *Id.* at 418.

Moreover, there is no legal limit on the number of references that can or should be combined in determining a motivation to combine. *See S. Ala. Med. Sci. Found. v. Gnosis S.P.A.,* 808 F.3d 823, 826 (Fed. Cir. 2015) ("Obviousness is a question of law based on underlying findings of fact, which include the motivation to combine **multiple** prior art references . . .") (emphasis added). Indeed, in *KSR*, the Supreme Court did away with "rigid and mandatory formulas" for demonstrating obviousness in favor of "an expansive and flexible approach." *KSR*, 550 U.S. at 419, 415.

------

[4] It is not surprising that the primary case relied upon by IV falls well before *KSR* and struggles with whether to apply obviousness only where the prior art "clearly suggests" a motivation to combine—a standard now rejected post-*KSR*. *See Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 724 (Fed. Cir. 1990). In any event, *Gillette* ultimately rejected a finding of obviousness because the evidence showed that the prior art actually taught away from the combination suggested by the invention, a circumstance not present under the facts of the instant case. *Id.*

As noted above, the question is one of fact and boils down to what one of ordinary skill in the art would have been motivated to do at the time of the invention. And while the inquiry is indeed from the time of the invention rather than in hindsight, the fact that multiple prior art references might need to be combined does not equate to an impermissible hindsight analysis.[5] *See, e.g., In re Warsaw Orthopedic, Inc.,* __ F.3d __, 2016 WL 4191193, at *5 (Fed. Cir. Aug. 9, 2016) (citing approvingly PTAB findings that "the combination of the known element of performing a spinal fusion procedure by laterally advancing instruments into the disc space (Jacobson) with the known element of using an 'interbody graft' in a spinal fusion procedure (Leu and Brantigan) would have resulted in no more than the predictable and expected result of performing a spinal fusion procedure (Jacobson) that includes inserting an implant into a disc space (Leu or

---

[5] IV cites *Grain Processing Corp. v. Am. Maize-Prods., Co.,* 840 F.2d 902, 907 (Fed. Cir. 1988) and *In re Fritch,* 972 F.2d 1260, 1266 (Fed. Cir. 1992) for the unremarkable proposition that hindsight should not be used to find obviousness. But *Grain* does nothing more than cite the hindsight admonition in dicta and *Fritch* simply finds no evidence to support a motivation to combine the prior art. Neither case does anything to support the application of the rule against hindsight in this case. Indeed, IV points to nothing in the record below to show that hindsight was applied in this case. Rather, the substantial evidence focuses on the time of the invention and Ericsson's arguments and the Board's findings are properly based on the motivations of one of skill in the art at the time of the invention. Appx15-20; Appx25-27; Appx245-246 (citing Appx1962-1964, ¶ 51); Appx266 (citing Appx1974-1975, ¶¶ 70-71); Appx272-274 (citing Appx1971, ¶ 63); and Appx548-553. That one of ordinary skill in the art at the time of the invention may have had to combine more than one prior art reference does not support a finding of hindsight.

Brantigan).”); *Rogers v. Desa Int'l Inc.*, 198 F. App'x 918, 921–23 (Fed. Cir. 2006) (discussing the teachings of numerous prior art references and other evidence to arrive at a conclusion of obviousness). In fact, *KSR* itself involved a determination of obviousness based on the teachings of four references – “Asano,” “the '936 patent,” “Smith,” and “Rixon.” *KSR,* 550 U.S. at 424-425. There is no requirement in *KSR* or its progeny that the teaching of each reference be paired with teachings from each other reference to cover all the pairs of references, as IV now suggests.

The Board properly applied this framework in finding the patents obvious under both grounds of prior art combinations asserted by Ericsson and provided sound reasoning to support its conclusions.[6] *KSR*, 550 U.S. at 418.

IV now seeks for this Court to reject the Supreme Court's expansive and flexible approach for obviousness, maintaining that, under the specific circumstances of this case, combining references using the teachings and logic of references A+B and references B+C to arrive at the combination of references

---

[6] While *KSR* and its progeny emphasize the importance of identifying the reason for the motivation to combine, those authorities do not mandate that the Board use any specific, magic language to justify its reasoning. Rather, the question is whether the evidence supports not just the existence of the elements in the prior art but also the motivation or teaching to combine the art. *See, e.g., InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1351 (Fed. Cir. 2014) (finding no evidence to support motivation to combine where expert testimony failed to identify any factual basis for such a combination by one of skill in the art).

28

A+B+C requires that Ericsson make illogical arguments. For example, IV warns that Ericsson must argue A+C even though aspects of references A and C are combined only through the teachings and logic of B. However, as noted above, there is no legal limit on the number of combinations that may be considered in determining whether a claim is rendered obvious and, as the record evidence demonstrates under two separate grounds, two different sets of references disclose and render obvious claim 1 as a whole. Appx15-20; Appx25-27; Appx245-246 (citing Appx1962-1964, ¶ 51); Appx266 (citing Appx1974-1975, ¶¶ 70-71); Appx272-274 (citing Appx1971, ¶ 63); and Appx548-553. Under the circumstances of this case, the Board properly found the combinations of prior art to render the patent claims obvious. Appx552-553; Appx18-19.

### B. The Board's Obviousness Analysis Is in Harmony with the Law and the Evidence and Did Not Lead to Anomalous Results.

#### 1. IV's alleged problem solved by the challenged claims is both incorrect and irrelevant to Ericsson's reasons to combine the prior art.

The Board's treatment of the multiple prior art references is in harmony with the law and the evidence, notwithstanding IV's efforts to orchestrate problems that don't exist. For instance, IV argues that the prior art references "do not even relate to the challenge addressed by the claimed invention," (IV Br. at 27), but this argument is both factually incorrect and irrelevant to Ericsson's reasons to combine the prior art.

29

First, as demonstrated in the IPR proceeding below, IV is incorrect in its allegation (IV Br. at 27-28) that the claim requires "roaming," as the challenged claims in fact do not require "roaming." Appx550. Indeed, IV's expert was asked during cross-examination whether claim 1 required "roaming," and he could not offer an opinion. Appx550 (citing Appx3143, 141:7-9).

Second, even if IV were correct that the challenged claims solve a problem related to "roaming," this fact would have no legal bearing on whether the prior art references are required to be directed to the same problem addressed by the claim. According to *KSR*, "[i]n determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls. What matters is the objective reach of the claim. If the claim extends to what is obvious, it is invalid under § 103." *KSR,* 550 U.S. at 419. The cases cited by IV do not change this principle. Rather, the cases cited by IV stand only for the proposition that the fact that a prior art reference was intended to address a different problem may be a relevant fact to consider in deciding whether the evidence shows one skilled in the art would be motivated to combine the reference to achieve the claimed invention. *See Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1334 (Fed. Cir. 2013); *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1343, 1366-1367 (Fed. Cir. 2012).

Also contrary to what IV seems to suggest, the primary purpose, described invention, or preferred embodiment of a prior art reference do not control in determining whether a claim is obvious. *In re Applied Materials, Inc*., 692 F.3d 1289, 1298 (Fed. Cir. 2012) ("A reference must be considered for everything that it teaches, not simply the described invention or a preferred embodiment."); *In re Mouttet*, 686 F.3d 1322, 1331 (Fed. Cir. 2012) ("A reference may be read for all that it teaches, including uses beyond its primary purpose."). IV violates these legal principles in suggesting that references addressing different problems cannot be combined to demonstrate obviousness. IV Br. at 28.

IV's citation to its expert's opinion regarding the different aspects of wireless communications is also unavailing. IV Br. at 28. This is because, as demonstrated above, the different problems allegedly addressed by the different references do not weigh against Ericsson's articulated reasoning for combining the references.

## 2. Substantial evidence supports combining Yamaura and Beta through Li.

Ericsson provided a detailed explanation in its Petition (and supporting evidence) of why a person of ordinary skill in the art would have combined (1) Li and Yamaura, Appx245-246, and also combined (2) Li and Beta, Appx265-266. Rather than arguing the merits of Ericsson's substantial evidence supporting reasons to combine, IV instead merely disagrees with the way the reasons to

31

combine were organized in the Petition. IV Br. at 29. As is readily apparent, though, and as presented in rebuttal to a similar allegation in the proceeding below, Yamaura and Beta would be combined through Li, by adding features to Li's system. Appx551. Thus, there is no deficiency in the way Li, Yamaura, and Beta are combined, and the reasons to combine Li, Yamaura, and Beta are supported by substantial evidence.

### C. IV's New Arguments Regarding Inoperability and Teaching Away Are Not Properly Before the Court and Would Fail In Any Event Because They Are Not Factually Accurate

#### 1. IV's arguments regarding inoperability for the Mody combination were not raised before the Board and should not be considered by this Court.

It is axiomatic that a party is bound by the arguments raised below and new arguments will not ordinarily be heard on appeal. *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1323 (Fed. Cir. 2008) ("This is an appellate court and as such we abide by the general rule that new arguments will not be decided in the first instance on appeal."). This is true both for arguments never raised and arguments mentioned but never properly developed below. *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1296 (Fed. Cir. 2009) (finding that if a party "presents only a skeletal or undeveloped argument" in the proceeding below, this Court "may deem that argument waived on appeal.").

At best, IV made a skeletal argument in the proceeding below regarding inoperability and then, only as to the Zhuang combination. The entirety of IV's inoperatility argument below consists of four sentences at the end of a four-page section of its Response Brief and is recited here in its entirety:

> "But Haas's argument overlooks the consequences of this combination as it relates to the already offered combination of Li and Yamaura. Li already teaches a pilot sequence and, more importantly, discloses using that pilot sequence to communicate information of cluster usage. Exhibit 1002 at 12:45–55. A person of ordinary skill in the art at the relevant time considering a combination of Li with Yamaura would have recognized that replacing Li's pilot sequence with Zhuang's GCL pilot sequence would render Li *inoperable* for its intended purpose of cluster allocation. Exhibit 2001 at ¶¶154–157. This is sufficient to dissuade a person of ordinary skill in the art from further combining Zhuang's pilot sequence with the combination of Li and Yamaura. *Id.* at ¶157."

Appx506 (emphasis added). The highlighted instance of "inoperable" above is the only instance of this term or any variant of "inoperable," such as "inoperability," in the *entire* Patent Owner Response. And, other than a passing mention during the Oral Hearing, IV made no argument about inoperability regarding the Mody combination. Further, other than being asked during the Oral Hearing about a "teaching away," Appx639, IV made no mention of teaching away in the proceeding below.

In contrast, IV now impermissibly seeks to (1) extend its skeletal argument regarding inoperability of the Zhuang combination to the Mody combination, and (2) extend its arguments to include teaching away. In addition, IV now seeks to

support its arguments regarding inoperability using previously uncited expert testimony and putting forth new propositions about inoperability based on the previously uncited testimony. Thus, IV's arguments regarding inoperability for the Mody combination should not be considered by this Court as they are waived. Further, IV's new arguments regarding the combination of prior art including Zhuang that go beyond those made in the proceeding below should also be waived. These "new" arguments that IV has waived by failing to raise below include the following:

- **_Inoperability based on Mody, Nobilet, and Popovic_**
  - o IV never made its current argument in the proceeding below that "pilot sequences … from Mody, Nobilet and Popovic (Challenge 4) would render inoperable the variable bandwidth system disclosed in Li." IV Br. at 32.
  - o IV states that "Intellectual Ventures submitted unrebutted expert testimony explaining why the proposed use of pilot sequences … from Mody, Nobilet and Popovic (Challenge 4) would render inoperable the variable bandwidth system disclosed in Li. Appx3452-55 [IV expert declaration] at ¶¶ 154-57; Appx3003 [IV expert cross-examination], 3174 at 172:14-17." Br. at 32 (emphasis in original). But, the deposition testimony cited by IV (Appx3174 at 172:14-17) was not cited anywhere in the record below, and it makes only passing reference to Mody, Nobilet, and Popovic in any event. IV's cited expert testimony (Appx3452-55 at ¶¶ 154-57) addresses only Zhuang, not Mody, Nobilet and Popovic. Thus, any arguments about why the combination of Mody, Nobilet, and Popovic combined with Li would render Li inoperable are waived.

- **_Teaching away_** -- discussion of whether the references describe a teaching away from the claimed invention. Br. at 31-32, 36-38. These arguments were never raised below.

- **_Uncited evidence_** – IV sprinkles into its arguments citations to previously uncited evidence to support its propositions. For example, IV cites three times to numerous paragraphs of expert testimony, namely Appx3423-27 at ¶¶ 67-80,

never cited in any paper in the proceeding below, as supporting its propositions. IV Br. at 32, 36.

The evidence newly presented before this Court and the related arguments could not have been made in the proceeding below. The Board in its Order Trial Hearing Notice specified that:

> The parties are directed to *St. Jude Medical, Cardiology Division, Inc. v. The Board of Regents of the University of Michigan*, Case IPR2013-00041, Paper 65 (PTAB Jan. 27, 2014), and *CBS Interactive Inc. v. Helferich Patent Licensing, LLC*, IPR2013-00033, Paper 118 (October 23, 2013), for guidance regarding the appropriate content of demonstrative exhibits.

Appx590. Per the Board's directive, consulting *St. Jude Medical*, Paper 65 reveals that "[n]or can the [oral argument] exhibits rely on evidence that, although it is in the record, was never specifically discussed in any paper before the Board." The conduct of the oral hearing was consistent with the Patent Trial Practice Guide, which states that by the time the proceeding reaches the oral hearing "[a] party … may only present arguments relied upon in the papers previously submitted. No new evidence or arguments may be presented at the oral argument." *Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,768 (Aug. 14, 2012). Thus, IV's reliance on evidence, although in the record, that was never specifically discussed in any paper violates Patent Office rules and the Board's directive in the proceeding below. In accordance with that directive, many of the arguments now made with regard to Li and Zhuang could not have been made in the proceeding below.

Further, the notion of teaching away arose for the first time during the oral argument, when the Board brought up the subject of "teaching away" during questioning:

> JUDGE JOHN LEE: Are you saying that there's something in Li that would ***teach away*** from the combination, and if so, what is it?
>
> MS. HWANG: What's in Li is that there's a discussion of providing, and this is what Dr. Zeger is talking about here, Li provides pilot sequences, and those pilot sequences either are 1s or -1s, and I think that's in another slide, but –
>
> JUDGE JOHN LEE: I understand the pilot sequences work differently.
>
> MS. HWANG: Yes.
>
> JUDGE JOHN LEE: What I'm asking is is there a teaching away, is there a disparagement, a criticism in Li that you're pointing to as a ***teaching away*** from the proposed combination?
>
> MS. HWANG: What we're saying is that Li – Zhuang renders Li inoperable, and that is sort of the ultimate ***teaching away***. …

Appx639:13-640:5 (emphasis added). Thus, IV relies on its argument of inoperability as to the Zhuang combination as the "ultimate teaching away."

The Board's characterization of teaching away as whether there is "a disparagement, a criticism in Li" is consistent with established Federal Circuit case law. For example, "a reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *In re Mouttet*, 686 F.3d 1322, 1333-1334 (Fed. Cir. 2012) (internal quotation marks and citation omitted). IV has not pointed to any teaching in Li that would have led a person of ordinary skill in a direction

divergent from combining it with Yamaura's preambles and using Zhuang's preamble sequences as a sequence for Yamaura's preambles. Thus, IV's teaching away argument should be rejected.

IV's new arguments regarding (1) the set of prior art of Li, Yamaura, Beta, Mody, Nobilet, and Popovic, and (2) teaching away were not made in the proceeding below and are therefore waived. Further, the Board's analysis of whether there was any teaching away from the claimed invention is consistent with this Court's case law on teaching away and the failure to find teaching away is supported by substantial evidence.

> **2.    IV's arguments for the Zhuang combination fail because they mischaracterize Ericsson's combination, and the Board's analysis, of Li and Zhuang.**

Ericsson relies on Yamaura for the use of preambles to initialize communications between a base station and mobile unit, and on Zhuang's teaching of the types of preamble sequences that would be suitable for this purpose. IV's arguments regarding inoperability rest on an *incorrect* premise – that Ericsson's combination of Li and Zhuang relies on *replacing* pilot signals in Li with pilot signals from Zhuang. IV Br. at 33. It does not. Both the Petition and claim 1 of the '431 Patent address preambles, not pilot symbols. Ericsson has never made any arguments that Zhuang's pilot signal replaces any pilot signals in Li, and the

Board's conclusions do not rely on any such evidence. The Board's analysis makes

this clear:

> Patent Owner's argument that Zhuang's teachings would render Li's pilot symbols inoperable for their intended purpose does not persuade us that Petitioner failed to meet its burden in demonstrating that an ordinarily skilled artisan would have combined Yamaura and Zhuang, because ***Petitioner's proposed combination does not use Li's pilot symbols***. ***Petitioner merely relies on Li for its teaching of a variable bandwidth system***.

Appx19-20. Consistent with the Board's finding, Ericsson pointed out in its

Petition that "Zhuang describes the use of a preamble sequence at the beginning of

an OFDM transmission ('[a] pilot signal (<u>or preamble</u>) is commonly used for

communication systems to enable the receiver to perform a number of critical

functions […]' *Id.*, 1:12-14 (emphasis added); *See also*, ERIC-1012, ¶ 53."

Appx251-252. The cited ERIC-1012, ¶ 53 (Appx1965) states:

> "Zhuang describes the use of a pilot sequence at the beginning of an OFDM transmission. Because of its location at the beginning of a transmission, the pilot sequence is a preamble."

Appx1965 at ¶ 53. Also shown in ERIC-1012, ¶ 53 (Appx1966) is the following

annotated figure.



FIG. 2

Appx1966 at ¶ 53. Thus, it was clear from the Petition that Zhuang is used for its

teaching of preamble sequences[7].

Reasons to combine aspects of Zhuang and Yamaura are provided in

Ericsson's Petition, with a focus on preambles. For example, the Petition states:

> Reasons to Combine. As discussed above, Yamaura recognizes
> that **crosscorrelation is a useful feature of a <u>preamble</u>**. **Zhuang's
> <u>preambles</u>** offer improvements in crosscorrelation, while at the same
> time providing benefits of good autocorrelation and low PAPR. It
> would have been obvious to one of ordinary skill in the art to apply
> the **known technique of using chirp-like sequences in a <u>preamble</u> in
> an OFDM system, as disclosed by Zhuang, in the known OFDM
> system of Yamaura, which uses <u>preamble sequences</u>** (*see*, *e.g*.,
> ERIC-1012, ¶¶ 43 and 48), to yield known and predictable results
> (including the benefits provided by Zhuang's good correlation
> properties and low PAPR). *Id*., ¶¶ 56-58.

Appx252-253 (emphasis added). For the combination of Li and Yamaura, the

Petition states, for example:

---

[7] As stated in the Petition: "[t]he term 'preamble' denotes a transmission near the
beginning of a transmission, such as a frame or slot." Appx240.

Thus, while Li recognizes that OFDM-based communication systems typically include control and synchronization channels, Yamaura teaches a particular implementation of control and synchronization signaling that has advantageous over other existing methods.

Appx246. The Petition further states: "[t]he control signals in Yamaura are transmitted in a ***broadcast preamble*** using the subcarriers centered at an operating frequency." Appx247 (emphasis added)[8]. Fig. 17 is annotated in the Petition as follows:



Appx248; see also Appx1958, ¶ 43.

In light of this substantial evidence, the Board recognized that:

---

[8] This reasoning appears in the analysis of Challenge #1, claim element 8.3. In the analysis of Challenge #2, claim element 1.8, the Petition states: "As discussed in Challenge #1, claim element 8.3, control signals in Yamaura are transmitted in a broadcast preamble." Appx267.

> Yamaura uses crosscorrelation values of its ***preambles*** to identify stations being called. See Pet. 27 (citing Ex. 1003, 19:64–67, 20:14–19). Zhuang teaches using chirp sequences in ***preambles*** to improve crosscorrelation properties. Accordingly, we find an ordinarily skilled artisan would have combined Zhuang's chirp-like sequences having improved crosscorrelation properties with Yamaura's ***preambles***.

Appx19 (emphasis added). The Board also recognized that: "[w]e agree with Petitioner that Li and Yamaura focus on complementary aspects of wireless communication systems." Appx17.

Thus, Ericsson relies on Yamaura and Zhuang for preambles, and Yamaura's preambles are combined with Li's variable bandwidth. Li does not disclose any sort of communication using preambles. IV simply pattern-matches the term "pilot signal" or "pilot sequence" in Li with the term "pilot sequence" in Zhuang and mischaracterizes Ericsson's argument as "***replacing the pilot signals in Li*** with the pilot signals disclosed in Zhuang." There is no support for such a reading of Ericsson's arguments below or the Board's treatment of those arguments.

IV cites a number of cases intending to show that inoperability is a form of teaching away. IV Br. at 31. However, the case law cited by IV is inapplicable because IV's arguments rest on the false premise that Ericsson argues for *replacing* the pilot signals in Li with the pilot signals disclosed in Zhuang.

Further, IV repeatedly declares that its skeletal argument regarding Li's inoperability in view of Zhuang went unrebutted. *See, e.g.,* IV Br. at 31, 33. Of

41

course, the argument was so conclusory and skeletal that there was nothing to rebut. However, for the reasons provided above, IV's argument regarding inoperability is unpersuasive on its face and to the extent raised below, the argument was, in fact, rebutted. Ericsson pointed this out during the Oral Hearing:

> So, another issue that was raised was that the use of Zhuang's preamble sequences would destroy Li, and there was a lot to do about there wasn't much discussion. We fully explained the reason to combine Zhuang and Yamaura. *The fact that we didn't talk a lot about the pilots is because we're not talking about the pilots of Li. We're talking about preamble sequences and adding preambles to Li*. So, there was really no reason to address that in detail, other than to say, here is our combination, here is why we're making that combination, rather than address some strawman argument that's not particularly relevant.

Appx674 at 71:3-12 (emphasis added). The Board questioned IV extensively about its inoperability position during the oral hearing in order to understand and fully vet the argument. Appx639:13-Appx645:3. The Board correctly saw through IV's mischaracterization of Ericsson's combination of Li and Zhuang, and the Board's reasoning should be affirmed.

### D.    IV's New Argument Regarding the Combination of Li, Mody, Nobilet, and Popovic Is Incorrect.

In a cursory and conclusory manner, and, worse yet, citing previously uncited evidence to make a previously unmade argument, IV alleges: "Dr. Zeger further testified that the Board's second combination of references—Li, Yamaura, Mody, Nobilet, Popovic, and Beta—suffers from the same fundamental flaw.

Appx3174 at 172:14-17." IV Br. at 34 (footnote not included). IV refers to cross-examination testimony of Dr. Zeger (at Appx3174) that is just as conclusory regarding the Mody, Nobilet, and Popovic references. As discussed previously, IV never made this argument in the proceeding below, so the argument is waived.

The argument is also without merit. Ericsson did not rely upon Mody, Nobilet, or Popovic for pilot symbols, so any argument by IV that the references are relied upon for pilot symbols replacing Li's pilot symbols is incorrect.

Ericsson's Petition was clear that Mody's preambles, not Mody's pilot signals, were being combined with Yamaura. The Petition states, with respect to claim element 8.5:

> Mody discloses that its training sequences are part of the preamble ("[t]he present invention utilizes a sequence of *training symbols or preambles* […]" ERIC 1005, ¶ 9 (emphasis added).).

Appx271 (emphasis in original). Further with respect to claim element 8.5, the Petition states:

> It would have been obvious to one of ordinary skill in the art to apply the known technique of using chirp-like sequences ***in a <u>preamble</u>, as disclosed by Mody, in the known OFDM system of Yamaura, which uses <u>preamble sequences</u>***, to yield known and predictable results.

Appx272 (emphasis added). The analysis of claim element 1.8 in the Petition refers to Yamaura as disclosing the claimed "primary preamble," and the analysis of claim element 1.10 refers to the analysis of claim element 8.5 for Mody's disclosure of preamble properties. Appx281. Nobilet and Popovic

describe the mathematical properties of Mody's sequences. *See* Appx272-275.

Mody does not use the term "pilot symbols" interchangeably with preambles, as Mody makes a distinction between a "preamble" and "pilot symbols":

> ***Symbols inserted periodically within the data symbols will be referred to herein as "pilot symbols*****.**" These periodic pilot symbols may be inserted anywhere in the stream of the data symbols. If a continuous burst of symbols is inserted by the pilot/training symbol inserter 32, ***this type of symbol will be referred to herein as "training symbols" which constitute the preamble***. The training symbols preferably are inserted at the beginning of the frame. However, the training symbols may be inserted onto the frame in a location other than at the beginning of the frame, such as at the end or in the middle of the frame.

Appx809, ¶ [0038] (emphasis added). Thus, in Mody's embodiments, training symbols constitute a preamble, and pilot symbols are different than training symbols.

Additional evidence of the distinction between pilot symbols and preambles is provided in reference to Fig. 4. According to Mody:

> FIG. 4 illustrates an example of a frame 52 that is transmitted across the channel 19 from the transmitting antennas 18 to the receiving antennas 20. The ***frame 52 comprises a preamble 54 comprising a number of training symbols $N_t$*** and cyclic prefixes G. … As previously mentioned, the pilot/training symbol inserter 32 further inserts ***pilot symbols (not shown)*** intermittently within the OFDM data symbols N.

Appx811 at ¶ [0052]. Thus, in Figure 4, a preamble is shown whereas pilot symbols are not shown, providing further proof of Mody's distinction between preambles and pilot symbols.

Accordingly, IV cannot draw any sort of equivalence between pilot symbols and preambles in Mody to enable IV to assert that the pilot symbols of Mody <u>replace</u> pilot symbols in Li. It is clear from Mody's disclosure that Mody's preambles are unrelated to Mody's pilot symbols, so IV cannot assert that Mody's pilot symbols are somehow placed into Li's system. IV's argument that Mody's pilot symbols replace Li's pilot symbols is, therefore, without merit.

### E.    Ericsson's Petition Is Legally Sufficient, and The Board's Rationale for Combining Li and Yamaura Is Supported by Substantial Evidence

Out of substantive arguments, IV nitpicks at the procedures followed below in an attempt to grab onto to any error it can find, arguing, for instance, that Ericsson's petition lacked the requisite detail to survive initial scrutiny. But the procedures below were sound and IV's arguments should be viewed as nothing more than a red herring.

For instance, IV complains that Ericsson's reasons to combine Li and Yamaura are provided with respect to claim 8 in the Petition, not claim 1, and that therefore the Petition was "legally insufficient" to demonstrate obviousness of claims 1 and 2. IV Br. at 39. This argument equates to a challenge to the Board's

decision to institute, which the Supreme Court has held is not appealable. *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142 (2016) ("We conclude that [35 U.S.C. § 314(d)] … does bar ... the Patent Office's decision to institute inter partes review."). Thus, IV's argument amounts to impermissibly seeking an appeal of the Board's decision to institute and should not be considered by this Court.

In any event, Ericsson's Petition and the subsequent proceedings below disclosed the reasons to combine Li and Yamaura and provided IV fair notice and an opportunity to be heard. Reasons a person of ordinary skill in the art would have combined aspects of Li and Yamaura are provided on pages 22-23 of the Petition. Appx245-246. The reasons to combine aspects of Li and Yamaura are supported by expert testimony, namely Appx1962-1964, ¶ 51, cited at Appx245 and 246.

Both IV and the Board understood Ericsson's reasons to combine Li and Yamaura applied generally across the claims. For example, Ericsson's cited expert testimony of Appx1962-1964, ¶ 51 discusses reasons to combine Li and Yamaura that apply generally to all the challenged claims. Also, the Board cited pages 22-23 of Ericsson's Petition for reasons to combine Li and Yamaura in its Decision to Institute claims 1 and 2. Appx376. Ericsson's rationale for combining Li and Yamaura is summarized by the Board in its Decision to Institute as follows:

> In particular, we agree with Petitioner that it would have been obvious to an ordinarily skilled artisan to incorporate Yamaura's OFDM signaling with Li's OFDMA variable bandwidth system because Yamaura teaches one way to provide control and synchronization

signaling using OFDM and, as pointed out by Petitioner, Li recognizes that other channels may be used for control signals.

Appx377-378. The Board adopted Ericsson's reasons to combine provided on pages 22-23 of the Petition. *Compare* Appx245-256 *to* Appx377-378. The cases cited by IV (IV Br. at 39) require that the Petition must adequately make out a case for invalidity and the PTO cannot substitute its expertise for record evidence, and those circumstances are clearly satisfied here. *See, e.g., Brand v. Miller*, 487 F.3d 862, 868-70 (Fed. Cir. 2007) (finding error in the Board's failure to apply the record evidence before it in determining issues of priority of invention and derivation); *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367-68 (Fed. Cir. 2016) (finding no substantial evidence to support motivation to combine); *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1367-68 (Fed. Cir. 2015) (remanding issue of obviousness for clarification of the Board's findings in light of the evidence presented).

IV questioned the merits of combining Li and Yamaura in its Patent Owner Response. Appx495-502. Ericsson rebutted IV's allegations in its Petitioner Reply, supported by cross-examination testimony of IV's expert. Appx548-551. IV had an extensive discussion with the Board during the oral hearing regarding the combination of Li and Yamaura. Appx645-653. Thus, as the Board recognized, IV had sufficient notice and an opportunity to be heard. Appx16 ("We conclude Patent

Owner had sufficient notice and a full and fair opportunity to respond to the combination of references as applied in our Decision.")

The Board evaluated the arguments and evidence provided by both parties and sided with Ericsson:

> We have reviewed the parties' arguments as well as the testimony of Dr. Haas (Ex. 1012 ¶¶ 34–51) and Dr. Zeger (Declaration of Kenneth Zeger, Ph.D., Ex. 2001 ¶¶ 67–85, 132–142), and we find that Petitioner has demonstrated that a person having ordinary skill in the art would have combined the teachings of Li and Yamaura in the manner proposed by Petitioner. We agree with Petitioner that Li and Yamaura focus on complementary aspects of wireless communication systems. Yamaura teaches one way to provide control and synchronization signaling using OFDM. Li teaches that 'there are typically other channels [not described in detail in Li], pre-allocated for the exchange of control information and other purposes,' which would have led an ordinarily skilled artisan to look to specific implementations of control and synchronization signaling, including the implementation taught by Yamaura.

Appx17-18 (brackets in original). Thus, the Board's rationale for combining Li and Yamaura is supported by substantial evidence.

### F. IV's Arguments Regarding Li's Teachings Are Both New (and, Therefore Waived) and Incorrect.

Rather than have this Court evaluate the merits of its arguments from the proceeding below, IV makes new arguments regarding the combination of Li and Yamaura. Specifically, IV cites Li, 6:30-36 (IV Br. at 41) in making a new argument about downlink control information (that Li discloses downlink control information). But IV never cited this portion of Li in its Patent Owner Response.

Thus, IV could not have made the same argument it makes now with respect to this portion of Li in its papers below. IV made this argument about Li disclosing downlink control information for the first time during the Oral Hearing. Appx3740. Thus, IV violated the PTO's requirement that, at oral argument, "[a] party … may only present arguments relied upon in the papers previously submitted. No new evidence or arguments may be presented at the oral argument." *Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,768 (Aug. 14, 2012).

In any event, IV mischaracterizes Ericsson's arguments regarding motivation to combine Li and Yamaura and claims that silence is "insufficient motivation for a person of skill in the art to seek out that element form another reference."  IV Br. at 40, n.8, 44. Contrary to IV's allegation, Ericsson never argued that Li was "completely silent" with respect to control information. As recognized in the Petition, "Li's disclosure focuses on the data traffic channels in an OFDM system but recognizes that there are typically other channels used for exchange of control information." Appx245. Far from "completely silent" with respect to control information, Li points out that there exist "other channels, pre-allocated for the exchange of control information and other purposes," but Li is focused on "data traffic channels":

> ***The techniques described herein are directed to* subcarrier allocation for *data traffic channels***. In a cellular system, there are typically other channels, pre-allocated for the exchange of control information and other purposes. These channels often include down

> link and up link control channels, uplink access channels, and time
> and frequency synchronization channels.

Appx732, 5:11-17 (emphasis added). Thus, Li provides the explicit motivation to a person of ordinary skill in the art to look to other references that teach implementations of control and synchronization signaling.

Claim 1 is directed to "a process performed by a base station of generating an information bearing signal for wireless transmission." Appx216, 9:35-37. As IV recognizes, "'downlink' refers to transmission from the base station to the mobile station." IV Br. at 40, n. 7. Whether Li discloses "uplink" control information, which is information from the mobile station to the base station, *id.*, is irrelevant to claim 1 because claim 1 is directed to transmissions from the base station, also known as downlink transmissions.

IV relies on Li's statement that "[a]fter cluster selection, the base station notifies the subscriber about the cluster allocation through a <u>downlink common control channel</u>…" IV Br. at 41 (citing Appx732 at 6:30-36) (emphasis in original). However, there is no information describing how this downlink control channel is structured (e.g., its timing or frequency characteristics), or how synchronization is performed. As discussed earlier, IV belatedly raised its argument about downlink control for the first time in the oral hearing. Appx3740. In response, Ericsson explained in the oral hearing that the downlink common control channel IV points to in Li presupposes that the base station and the mobile

50

station are already synchronized and have made contact, which would be provided by a preamble:

> Now, the Patent Owner is referring to a different portion of Li and drawing from that that there are downlink channels in that, and what they're referring to is in column 6. So, column 6, they're referring to the line at line 30, but if you read the statement above, starting at line 18, it talks about what is actually happening in Li. So, in Li, it's upon receiving the feedback from the subscriber. So, the subscriber has already been contacted before the other things happen. And then in the next paragraph, it receives feedback from the subscriber about traffic allocation and availability, and then after the base station allocates it, the base station notifies the subscriber, but the subscriber first has to provide uplink feedback to the base station. So, it's not the initial preamble.

Appx671-672 at 68:18-69:2. Thus, contrary to IV's allegation, Li's teaching at 6:30-36 is consistent with Ericsson's explanation that: "Li and Yamaura are directed at complementary aspects of building a wireless communication system. Li recognizes that it does not provide every detail about how to build a wireless communication system, leaving certain details to a POSA." Appx548.

IV further alleges that its expert testified that Li's exchange of pilot signals discloses downlink control information, citing to Appx3447 at ¶ 139. IV Br. at 41-42. However, IV never made this argument in the proceeding below. IV's Patent Owner Response cites to IV's expert testimony at ¶ 139 only once and for a different proposition (related to the problem solved by the '431 Patent). Specifically, in its Patent Owner Response, IV asserted:

51

> A person of ordinary skill in the art would not have consulted Li and Yamaura simultaneously when attempting to solve the problem described in the '431 patent; namely, to permit roaming by allowing at least basic radio operation through the transmission of radio control signals and operation signals in a primary preamble, then later transitioning to normal full-bandwidth operation. Exhibit 2001 at ¶¶138–142.

Appx501. Thus, IV's citation to ¶ 139 in its Patent Owner Response was for the proposition that the '431 Patent is directed to a different problem (to permit roaming) than Li and Yamaura. Ericsson rebutted this argument in its Petitioner Reply, explaining that claim 1 is not directed to roaming. Appx550. Further, regardless of whether IV's argument is waived, as explained earlier, Li is not relied upon for pilot signals, so IV's argument about Li's pilot signals is irrelevant.

IV further alleges that its expert's testimony is "unrebutted," and "there is no need to search outside of Li to make Li work." IV Br. at 42. However, as IV never made this argument in the proceeding below, Ericsson never had a chance to rebut it. IV makes similar arguments at p. 43, citing Appx3445-3447 at ¶¶ 135-139, but ¶¶ 136 and 137 are not previously cited in the proceeding below, and ¶¶ 135, 138 and 139 are cited for different propositions. *See* Appx501-502. Regardless, Li's isolated statement about a "downlink common control channel" after the communication session has already been initiated by a preamble does not teach any detail about this control channel, such as its timing or frequency characteristics.

Yamaura provides detail about the timing and frequency characteristics of a control channel.

## II.  THE BOARD'S FINDING THAT THE PRIOR ART DISCLOSES THE CLAIMED ELEMENTS IS SUPPORTED BY SUBSTANTIAL EVIDENCE.

IV disputes whether the prior art discloses the claimed (1) "core-band, including a plurality of subcarrier groups, substantially centered at an operating center frequency of the different communication schemes;" and (2) core-band that is "substantially not wider than a smallest possible operating channel bandwidth." The substantial evidence supporting these claim elements is discussed in turn.

### A.  The Board's Finding That the Prior Art Discloses the Claimed "Core-Band, Including a Plurality of Subcarrier Groups, Substantially Centered at an Operating Center Frequency of the Different Communication Schemes" Is Supported by Substantial Evidence.

Ericsson's combination of Li and Yamaura is in harmony with the law of obviousness, which does not require physical substitution of elements. *In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012) ("It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements.") (citing *In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir. 1983) ("[I]t is not necessary that the inventions of the references be physically combinable to render obvious the invention under

review."). Instead, "[a] reference may be read for all that it teaches, including uses beyond its primary purpose." *Mouttet*, 686 F.3d at 1331.

Ericsson's combination of Li and Yamaura is consistent with these legal principles. In replying to similar arguments IV made in its Patent Owner Response, Ericsson reasoned as follows.

> Yamaura discloses a narrowband control channel centered within a single operating channel bandwidth. For example, Yamaura discloses that in conventional OFDM systems a 'terminal station has to receive and decode the band signal (corresponding to 20 MHz) every 2 ms regardless of presence or absence of data being transmitted and received.' ERIC-1003, 5:44-47. In order to address this issue, Yamaura discloses a system in which 'part of control signals addressed to a terminal station from a base station is transmitted ***by means of a carrier whose band is narrower than that for said multi-carrier signals*** […]' *Id.*, 6:5-8. The narrowband control channel resides within a "core band" (different operating channel bandwidths are discussed in claim element 1.7 of the Petition with respect to Beta). Petition, pp. 43-44. The combination of Li and Yamaura, as would have been understood by a [person of ordinary skill in the art], is illustrated in annotated Fig. 17 of Yamaura below. *See* Supp. Haas Decl., ¶ 24 (ERIC-1034).



**Yamaura, Fig. 17 (annotated)**

> In view of the teaching of Yamaura that control information is transmitted by a central frequency band, a [person of ordinary skill in the art] would have centered Yamaura's control signals within Li's initially allocated basic clusters. *See id.*, ¶ 25. In order to maintain the benefits of Yamaura's narrowband control signals, Li's auxiliary clusters would have been placed so that the narrowband control signals remain at the center. *See id.*

Appx543-544 (emphasis in original). Thus, IV's argument that Ericsson "offered no explanation of why of how" Li's auxiliary clusters would be added in a proportional manner is without merit. IV Br. at 53.

Despite these authorities and evidence, IV is essentially requiring that Yamaura's preamble be physically combined with a specific embodiment of Li. *See* IV Br. at 49-51. Thus, IV misapplies the law of obviousness, which does not require physical substitution of elements. *Mouttet*, 686 F.3d at 1332.

The Board understood that Ericsson's articulated reasons to combine Li and Yamaura are consistent with this Courts legal principles regarding obviousness. The Board found that

> Petitioner relies on Yamaura for teaching transmission of control signals centered within the frequency band it is using, and relies on Li for teaching a variable bandwidth system, in which a mobile station can have its bandwidth increased or decreased, as needed. As discussed above, we find no flaw with Petitioner's proposed combination of Yamaura and Li.

Appx21. Thus, the Board's conclusion that the combination of Li and Yamaura teaches a "core-band substantially centered at an operating frequency of the different communication schemes," is supported by substantial evidence. Appx21.

55

**B.    The Board's Finding That the Prior Art Discloses a Core-Band That Is "Substantially Not Wider Than a Smallest Possible Operating Channel Bandwidth" Is Supported by Substantial Evidence.**

The parties' arguments about whether the prior art discloses the claimed "the core-band is substantially not wider than a smallest possible operating channel bandwidth of the system" turns on each parties' understanding of the claim term "substantially not wider." Ericsson reasons that the term "substantially" is a term of approximation, whereas IV contends that the term "substantially" is a term of magnitude. For the reasons provided below, the Board was correct in siding with Ericsson.

**1.    The Board's understanding of the claim term "substantially not wider" is correct.**

Consistent with Ericsson's arguments in the proceeding below, both the plain language of claim 1 and the '431 Patent specification support interpreting "substantially" as a term of approximation, not a term of magnitude. As explained by the Board, the plain language of "not wider" is "less than or equal to." Appx11. IV agrees with that interpretation. Appx12. However, IV's proposed construction reads out the "equal to" portion of "not wider," which is inconsistent with the ordinary meaning of "not wider." Appx12. On the other hand, according to the Board: "[i]f we apply substantially to the phrase 'not wider' as a term of approximation, however, we are led to a construction that one item (the core-band)

56

is not wider, within some range of tolerance, than another item (the smallest operating channel bandwidth)." *Id.*

The '431 Patent specification also supports interpreting "substantially" as a term of approximation. As discussed in Ericsson's Petitioner Reply, there is nothing in the language of the specification or supporting provisional that suggests that the inventors meant to exclude embodiments that satisfy "less than or equal to" but do not satisfy the PO's construction "significantly not wider." Appx533. For example, the specification states that the "core band … ***is defined as*** a frequency segment that is ***not greater than*** the smallest operating channel bandwidth…" Appx213, 4:67-5:4 (emphasis added). Also, the provisional application incorporated into the '431 Patent, Appx212, 1:12 and 24-25, describes the core band as "less than or equal to," Appx3234.

The prosecution history is also part of the intrinsic record and should be consulted in construing the claims in an inter partes review. *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015) ("The PTO should also consult the patent's prosecution history in proceedings in which the patent has been brought back to the agency for a second review.").

The prosecution history supports interpreting the term "substantially" in "substantially not wider" as a term of approximation. The claims as originally filed included numerous instances of the term "substantially," including the phrase

"substantially not wider than a smallest possible operating channel bandwidth of the system." Appx1841. In response to a potential indefiniteness rejection, the Applicant addressed the use of the term "substantially" as follows:

> Applicants also submit that applicants' use of "substantially" is definite under § 112, second paragraph due *at least to limitations of the English language as well as real-world technological limitations*. For instance, applicants' phrase "a core band ... **substantially** centered at an operating center frequency[,]" *and similar*, balance clarity with the fact that real-world systems have process and operational tolerances whereby a core-band **may not be exactly** centered at an operating center frequency despite efforts to center the core band at the operating center frequency. Accordingly, one of ordinary skill in the relevant art would understand applicants' use of "substantially" in the above claims.

Appx1725 (emphasis added). The term "substantially" is thus used in the claims as a term of approximation in order to "balance clarity with the fact that real-world systems have process and operational tolerances," which contradicts IV's position that the term "substantially" denotes a term of magnitude. Appx1725.

IV cites to *Epcon Gas Sys*., *Inc*. v. *Bauer Compressors*, *Inc*., 279 F.3d 1022, 1030-31 (Fed. Cir. 2002) as support for its argument that "'substantially' can be used as a term of approximation or a term of magnitude—both within the same claim, depending on context." IV Br. at 58. However, *Epcon* is inapplicable here, because the phrase at issue in *Epcon*, "substantially below," "was added to the claims during prosecution to distinguish the claimed invention over the prior art Baxi reference," and any interpretation of "substantially below" that allowed any

manner of "above" was disallowed by the prior art. *Epcon*, 279 F.3d at 1031. In the case at hand, the term "substantially not wider" was <u>not</u> added to distinguish over a prior art magnitude, but rather, as described in the prosecution history, the term "substantially" was used to "balance clarity with the fact that real-world systems have process and operational tolerances." Appx534.

IV claims that Ericsson's expert agreed that "substantially" means "significantly," implying that Ericsson's expert agreed that "significantly not wider" excludes "equal to." IV Br. at 59. However, Ericsson's expert did not interpret the claim to exclude "equal to," because according to his understanding "100 kilohertz is significantly not wider than 100 kilohertz." Appx3605 at 122:3-7.

IV refers to the only numeric example given in the specification, comparing 4 MHz to 5 MHz to argue that 4 MHz is "significantly narrower than" 5 MHz. IV Br. at 56. However, the specification gives no indication of how to determine when one bandwidth is "significantly narrower than," as opposed to simply "narrower than," another bandwidth. As a result, IV's expert could not give any explanation where the boundary lies between "significantly narrower than" as opposed to simply "narrower than." Appx3102 at 100:9-19. IV's expert also could not explain whether the term "significantly" implies a percentage difference or an absolute difference. Appx3105-3106 at 103:22-104:12. Thus, IV's proposed construction of "significantly narrower than" makes the claim term more ambiguous.

IV alleges that Ericsson's construction "does not make sense," IV Br. at 59, but it is IV's construction, which requires this Court to rewrite "not wider" as "less than," that does not make sense. IV alleges, for example, that "[i]f the core-band is equal in width to the smallest operating channel, as Ericsson proposes, there would be no room for the side-bands." IV Br. at 60. IV is incorrect. There are other operating channels, which are necessarily larger than the "smallest operating channel," and these operating channels would have side-bands. Further, neither of the challenged claims includes a "side-band" in the claim.

Contrary to IV's allegation that "[t]he Board's reasoning is flawed," (IV Br. at 61), the Board's reasoning is properly based on intrinsic evidence, namely, the plain language of the claims and the specification. Additional intrinsic evidence – namely, the prosecution history – lends further support to the Board's construction.

2.    **The prior art discloses "the core-band is substantially not wider than a smallest possible operating channel bandwidth" under a correct construction of "substantially not wider."**

The parties' arguments about whether the prior art discloses the claimed "the core-band is substantially not wider than a smallest possible operating channel bandwidth of the system" turns on each parties' understanding of the claim term "substantially not wider." Ericsson reasons that "substantially not wider" includes "equal to," and therefore 100 kHz, the bandwidth of the 24 subcarriers disclosed in Beta, is "substantially not wider" than 100 kHz, the smallest possible operating

channel bandwidth of the Beta system. Appx266-267. IV disagrees that 100 kHz is "substantially not wider" than 100 kHz. IV Br. at 63. The Court's construction of "substantially not wider" will resolve the dispute whether the prior art discloses "the core-band is substantially not wider than a smallest possible operating channel bandwidth of the system."

## CONCLUSION AND PRAYER

For the foregoing reasons, the Appellee urges the Court to affirm the Board's Final Written Decision and grant it such other relief to which it may be entitled.

Respectfully Submitted,

*/s/ J. Andrew Lowes*
J. Andrew Lowes
Clint S. Wilkins
**HAYNES AND BOONE LLP**
2505 N. Plano Road, Suite 4000
Richardson, Texas 75082
Telephone: 972.680.7557
Facsimile: 972.692.9057
*Andrew.Lowes@haynesboone.com*
*Clint.Wilkins@haynesboone.com*

Debra J. McComas
**HAYNES AND BOONE LLP**
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Telephone: 214.651.5375
Facsimile: 214.200.0525
*Debbie.McComas@haynesboone.com*

**Attorneys for Appellees, Ericsson Inc.
and Telefonaktiebolaget LM Ericsson**

## ECF CERTIFICATION

I hereby certify that (i) the required privacy redactions have been made pursuant to Federal Rule of Civil Procedure 5.2; (ii) the electronic submission is an exact copy of the paper document; (iii) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses; and (iv) the paper document will be maintained for three years after the mandate or order closing the case issues.

*/s/ J.Andrew Lowes*
J. Andrew Lowes

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because:

■    this brief contains 13,948 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

■    this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14 point Times New Roman font.

*/s/ J.Andrew Lowes*
J. Andrew Lowes

15929544

63

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on  September 12, 2016
by:

☐ U.S. Mail

☐ Fax

☐ Hand

☒ Electronic Means (by E-mail or CM/ECF)

| J. Andrew Lowes | /s/ J. Andrew Lowes |
|---|---|
| Name of Counsel | Signature of Counsel |

| | |
|---|---|
| Law Firm | Haynes and Boone, LLP |
| Address | 2505 North Plano Road, Suite 4000 |
| City, State, Zip | Richardson, Texas  75082 |
| Telephone Number | 972.680.7557 |
| Fax Number | 972.692.9057 |
| E-Mail Address | andrew.lowes@haynesboone.com |

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

Reset Fields